*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0325P (6th Cir.)
File Name: 04a0325p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellant,*

　　　*v.*　　　　　　　　　No. 02-6146

WILLIAM EDWARD
RICHARDSON,
　　　*Defendant-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Columbia.
No. 02-00002—Thomas A. Higgins, District Judge.

Argued: December 4, 2003

Decided and Filed: September 24, 2004

Before: KENNEDY, MARTIN, and MOORE, Circuit
Judges.

———————

## COUNSEL

**ARGUED:** Steven L. Lane, U.S. DEPARTMENT OF
JUSTICE, CRIMINAL DIVISION, Washington, D.C., for
Appellant. Hugh M. Mundy, FEDERAL PUBLIC
DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee.

**ON BRIEF:** Steven L. Lane, U.S. DEPARTMENT OF
JUSTICE, CRIMINAL DIVISION, Washington, D.C., Debra
Teufel Phillips, ASSISTANT UNITED STATES
ATTORNEY, Nashville, Tennessee, for Appellant. Hugh M.
Mundy, C. Douglas Thoresen, FEDERAL PUBLIC
DEFENDER'S OFFICE, Nashville, Tennessee, for Appellee.

MARTIN, J., delivered the opinion of the court, in which
MOORE, J., joined. KENNEDY, J. (pp. 11-16), delivered a
separate dissenting opinion.

———————

## OPINION

———————

BOYCE F. MARTIN, Jr., Circuit Judge. The United States
of America appeals the district court's grant of William
Edward Richardson's motion to suppress evidence seized
from a vehicle in which he was a passenger. In light of the
specific facts of this case and for the reasons that follow, we
AFFIRM.

### I

On October 19, 2000, Officer Darryl Fisher noticed a
vehicle recklessly swerving between two eighteen-wheel
trucks on Interstate 65 in Tennessee. Officer Fisher pulled the
vehicle over for following too closely in violation of section
55-8-124 of the Tennessee Code. The entire traffic stop was
recorded by the video camera in Officer Fisher's police car.

The following people were traveling in the vehicle: the
driver, Ricky Collier; the defendant, Richardson;
Richardson's wife, Shirley Richardson; and their son,
William Darnell Richardson, whom we refer to as Darnell.
Officer Fisher requested to inspect Collier's license. At this
point, Officer Fisher noticed that the occupants of the vehicle
appeared nervous. In particular, he noticed that Collier's

hand trembled as he presented his license and Darnell's lips quivered as he spoke. Upon learning that Shirley Richardson was the owner of the vehicle, Officer Fisher requested to inspect her driver's license and registration. As she searched for this information, Shirley spilled all of the contents of her purse onto the floorboard. Officer Fisher perceived this action as a sign of nervousness. He asked the vehicle's occupants about their travel plans, to which Darnell responded that they had been to Nashville to see his lawyer. The videotape's sound recording reveals that Darnell also muttered something about having a back problem.

Officer Fisher then asked Collier to step to the back of the car. There, Officer Fisher informed Collier that he was going to issue a warning citation for traveling too closely to the first truck. Collier remained behind the car while Officer Fisher returned to his police car, where he narrated his impressions of the incident into the video camera, specifically noting the nervous appearance of the vehicle's occupants.

When Officer Fisher returned, he asked Collier about his travel plans. Collier responded that they had gone to Nashville to see a doctor. Officer Fisher then gave the citation to Collier and shook his hand, and Collier turned around to return to his vehicle.

At that point, Officer Fisher asked Collier to answer a few more questions, and Collier agreed. Officer Fisher asked whether there were any drugs, money, or guns in the car, to which Collier responded in the negative. Then, instead of allowing Collier to return to the vehicle, Officer Fisher asked Collier to remain behind the car while he asked Shirley Richardson for permission to search the car.[1]

---

[1] There is some dispute over the precise language that Officer Fisher used to indicate that he desired Collier to remain behind the car. The United States asserts that the district court erred as a factual matter in finding that Officer Fisher told Collier to "wait where he was" and instead asserts that Officer Fisher stated, "Okay, just hang out right here for me,

While Officer Fisher and Collier were talking, Darnell moved to the driver's seat. Thus, when Officer Fisher returned to the driver's side of the car, he asked Darnell for his driver's license. Darnell complied and Officer Fisher was satisfied with his identification. Officer Fisher then asked Darnell whether there were any guns in the car. Darnell responded that he had a gun in the vehicle. Darnell explained that his employer, the Lawrence County Sheriff's Department, authorized him to carry the gun. Darnell gave permission to Officer Fisher to inspect the gun. Upon inspection, Officer Fisher discovered that the gun was loaded. He stated that he would have to inquire into Darnell's employment and permit to carry the gun. Before doing so, however, Officer Fisher asked for permission to search the vehicle. The parties dispute whether Shirley Richardson gave her consent at this time.

Officer Fisher then radioed for assistance and also contacted the Lawrence County Dispatch to inquire about Darnell's employment. The dispatcher erroneously informed him that Darnell was not employed there and had been arrested a few times for drug possession. At this point, Officer Tommy Goetz arrived on the scene to assist.

Officer Fisher asked the occupants to exit the vehicle and empty their pockets. Defendant Richardson stated that his pants were too tight to empty his pockets. Officer Fisher patted down Richardson and noticed that Richardson turned his body to the left. Officer Fisher felt something on Richardson's left side. He proceeded to ask Shirley Richardson again whether he could search the vehicle and she responded in the affirmative. After Officer Fisher told Officer Goetz that he had felt something on defendant Richardson's left side, Officer Goetz conducted a second pat-down and discovered a handgun in Richardson's pocket.

---

okay?" This dispute, however, is not significant to our analysis and conclusion.

Richardson was placed under arrest and subsequently indicted for possession of a firearm by a convicted felon in violation 18 U.S.C. §§ 922(g)(1) and 924(a). He moved to suppress the handgun evidence as fruit of an unlawful seizure. The district court granted the motion to suppress, holding that Officer Fisher seized the vehicle and its occupants for no reasonable suspicion. The United States filed this timely appeal.

## II

In reviewing the judgment, we are asked to decide two questions: 1) whether the vehicle and its occupants were unlawfully seized following the conclusion of the traffic stop, and 2) whether the handgun evidence found thereafter was fruit of the unlawful seizure. We review the district court's factual findings in a suppression hearing for clear error and the district court's conclusions of law de novo. *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir.), *cert. denied*, 531 U.S. 881 (2000); *United States v. Guimond*, 116 F.3d 166, 169 (6th Cir. 1997), *cert. denied*, 530 U.S. 1268 (2000); *United States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir. 1996). Also, because we are reviewing the grant of a motion to suppress, we review the evidence "in the light most likely to support the district court's decision." *Guimond*, 116 F.3d at 169 (quoting *United States v. Roark*, 36 F.3d 14, 16 (6th Cir. 1994)).

### A. Seizure of the vehicle and its occupants

The primary interests that the Fourth Amendment protects include an interest in freedom of movement and insulation from the fear and anxiety produced by unlawful seizure. In the traffic stop scenario, these interests are personal to all occupants of the vehicle that is detained, *United States v. Mesa*, 62 F.3d 159 (6th Cir. 1995), because the detention affects an occupant's interest in freedom from such seizures. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990) (recognizing that a passenger may challenge his

detention because all occupants of a stopped vehicle are subject to a Fourth Amendment seizure); *see also Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (noting that each occupant has an interest in freedom from random, unauthorized, investigatory seizures); *United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994) ("interest in freedom of movement and the interest in being free from fear and surprise are personal to all occupants of a vehicle").

Unlawful seizure occurs when an officer, without reasonable suspicion, "by means of physical force or show of authority . . . in some way restrain[s] the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). One's liberty is restrained when a reasonable person would not feel free to walk away and ignore the officer's requests. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000), this Court determined that "[o]nce the purposes of the traffic stop [are] completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *See also United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention."). Thus, in determining whether the Fourth Amendment forbids the action taken by Officer Fisher in this case, we must decide whether there was a seizure, and, if so, whether Officer Fisher had reasonable suspicion for effecting the seizure.

In determining whether a particular encounter between an officer and a citizen constitutes a seizure, we recognize that words alone may be enough to make a reasonable person feel that he would not be free to leave. *See United States v. Buchanon*, 72 F.3d 1217, 1233 (6th Cir. 1995) (quoting *Mendenhall*, 446 U.S. at 554). In the instant case, the traffic

stop concluded when Officer Fisher handed Collier the citation and shook his hand. Collier was then free to leave, until Officer Fisher asked him to remain behind the vehicle. The United States makes much of the fact that Officer Fisher did not display an intimidating demeanor or use coercive language, but rather said, "Okay, just hang out right here for me, okay?" Regardless of Officer Fisher's demeanor, however, his words alone were enough to make a reasonable person in Collier's shoes feel that he would not be free to walk away and ignore Officer Fisher's request. When the driver is not free to leave, neither are his passengers; indeed, the passengers are at the mercy of any police officer who is withholding the return of their driver. *See Sitz*, 496 U.S. at 450; *Prouse*, 440 U.S. at 653; *Kimball*, 25 F.3d at 5. Thus, defendant Richardson's freedom of movement was subject to the will of Officer Fisher for as long as Officer Fisher detained Collier behind the car.

The United States argues that while the occupants may not have wanted to leave the scene, that "says nothing about whether Officer Fisher's conduct toward them was coercive." However, so long as Collier obeyed Officer Fisher's instruction to remain outside of the vehicle, his passengers were as unable as he to leave the scene. Also, that Darnell moved from his original position to the driver's seat does not affect our conclusion. This movement by itself indicates nothing about his willingness to drive away without Collier or his belief that he could lawfully take such action.

## B. Reasonable suspicion

Having concluded that a seizure occurred, we now address whether Officer Fisher had the requisite reasonable suspicion to seize Collier and his passengers. In doing so, we must determine from the totality of the circumstances whether the seizure was supported by "'specific and articulable facts that give rise to a reasonable suspicion of criminal activity.'" *United States v. Orsolini*, 300 F.3d 724, 728 (6th Cir. 2002) (quoting *United States v. Palomino*, 100 F.3d 446, 449 (6th

Cir. 1996)). At the outset, we recognize that "[r]easonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). We view the evidence offered in support of reasonable suspicion using a common sense approach, as understood by those in the field of law enforcement. *Id.*

In support of its argument that reasonable suspicion justified the seizure, the government combines the following factors:

(1) Nervousness, as evidenced by Collier's trembling hand, Darnell Richardson's quivering lip and difficulty speaking, and Shirley Richardson's spilling of the contents of her purse;

(2) Allegedly conflicting explanations of their travel plans; and

(3) Darnell Richardson's movement to the driver's seat.

The district court concluded that there was nothing inherently suspicious about the group's nervousness in this instance. We agree, and note that although nervousness has been considered in finding reasonable suspicion in conjunction with other factors, *Mesa*, 62 F.3d at 162, it is an unreliable indicator, especially in the context of a traffic stop, *United States v. Saperstein*, 723 F.2d 1221, 1228 (6th Cir. 1983). Many citizens become nervous during a traffic stop, even when they have nothing to hide or fear. Also, the allegedly conflicting explanations of their travel plans are not mutually exclusive; it is entirely plausible that the group traveled both to see a doctor and a lawyer. Finally, even Officer Fisher stated that he was not concerned that Darnell Richardson moved to the driver's seat, and the United States has made no attempt to explain why such behavior would be suspicious. Indeed, there are innocent and plausible explanations for this

behavior—e.g., perhaps Darnell thought that Collier, after driving recklessly, needed to take a break from driving.

The United States argues that the district court erred by considering each factor individually and that when considering the factors in combination, reasonable suspicion existed to further detain Collier and his passengers. We recognize that even a string of innocent behavior added together may amount to reasonable suspicion of criminal activity. *See United States v. Arvizu*, 534 U.S. 266, 273-75 (2002). Yet, regardless of whether the district court improperly analyzed each factor individually, our independent review leads us to conclude that reasonable suspicion did not exist. *See United States v. Smith*, 263 F.3d 571, 591, 594 (6th Cir. 2001) (concluding, over the government's objection that the district court erred in analyzing each suspicious factor individually, that "[e]ven considering all of the government's proffered factors as a whole, we must conclude that [the] Officer . . . did not possess a reasonable, articulable suspicion that criminal activity was afoot"). Under the totality of the circumstances, the factors upon which the United States relies do not add up to a reasonable suspicion of criminal activity. Although "there is always a temptation in cases of this nature when . . . firearms are found to let the end justify the means," we must resist such temptation. *Mesa*, 62 F.3d at 163.

### III

Absent reasonable suspicion, the evidence obtained as a result of the unlawful detention in this case must be suppressed as fruit of the unlawful seizure. There is, however, an exception to the rule when the causal chain is broken by a voluntary statement. *United States v. Brown*, 422 U.S. 590 (1975); *United States v. Arias*, 344 F.3d 623 (6th Cir. 2003). The United States argues that even assuming that defendant Richardson was unlawfully seized, Darnell Richardson's voluntary, intervening admission that he was carrying a gun broke the causal chain between their illegal detention and the discovery that defendant Richardson carried

a gun, thereby purging the original taint of the unlawful seizure.

We shall, in our discretion, decline to address this argument because, as the United States conceded, it did not raise the argument before the district court. *See Singleton v. Wulff*, 428 U.S. 106, 120-21 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."). Indeed, courts of appeals generally should decline to consider arguments that were not raised below and were not passed on by the district court. *Hormel v. Helvering*, 312 U.S. 552, 556 (1941).

### IV

For the foregoing reasons, we affirm the judgment of the district court.

———————

**DISSENT**

———————

KENNEDY, Circuit Judge.  Because I believe that the conduct of Officer Fisher did not violate the defendant's Fourth Amendment rights, I would reverse the district court's decision finding that Officer Fisher seized the defendant when he requested Collier to remain outside the car while he intended to ask the car's owner for permission to search it.

Neither the defendant nor the majority question the validity of the traffic stop nor the questioning of Collier at the rear of the car.  Rather, the majority holds that once Officer Fisher's consensual questioning with Collier was completed, the officer was then required to permit Collier to immediately re-enter the car and thus permit the occupants, including the defendant, to be on their way; and that a delay, caused by the officer's decision to ask the owner for permission to search the car for drugs or guns, resulted in an unlawful detention of the defendant.  In reaching its conclusion, the majority relies upon our decisions in *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999) and *United States v. Mesa*, 62 F.3d 159 (6th Cir. 1995).  It cites these decisions for the same proposition, namely: "Once the purposes of the traffic stop [are] completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *Hill,* 195 F.3d at 264*; See also Mesa*, 62 F.3d at 162.  As the majority notes, the issue in this case is whether, after the completion of the traffic stop, the defendant was seized, and, if so, whether the seizure was supported by reasonable suspicion.

In *Hill*, a deputy sheriff pulled over a U-Haul for speeding.  195 F.3d at 261. While processing the traffic violation, which included running a check on the defendant's driver's license, retrieving and reviewing the U-Haul rental agreement, and

writing out the citation,  the deputy asked the driver and his passenger a number of questions concerning the purpose of their trip.[1] *Id.* at 261-63.  After he completed the processing of the traffic violation, the deputy decided to detain the occupants in order to have his drug detection dog sniff the U-Haul for the presence of narcotics. *Id.* at 263.  Refusing to permit the driver and passenger to leave in order to have a drug detection dog sniff the vehicle certainly constituted a detention of the driver and passenger.  For this detention to be justified, it needed to be based upon reasonable suspicion, which the court found existed. *Id.* at 270.

In *Mesa*, like *Hill*, the defendant was stopped for speeding.  After the defendant retrieved her driver's license, the officer "directed the defendant to sit in the back seat of [his] police vehicle." 62 F.3d at 160.  While the officer was writing out the warning citation, he asked her a number of questions regarding her destination. *Id.*  After he finished writing out the citation and received her signature on it, he did not allow her to leave his vehicle, and she could not have voluntarily left the vehicle because the doors to the back seat of the police car could not be opened from the inside. *Id.*  The officer then proceeded to ask the defendant "additional questions totally unrelated to the initial traffic stop." *Id*. at 161.  Eventually, the officer asked for, and obtained, her consent to search her vehicle. *Id.*  The court opined, as did the court in *Hill*, that "[o]nce the purposes of the initial traffic stop were completed, ... the officer could not further detain the vehicle or its occupants ... [without] reasonable suspicion to justify [it]." *Id*. at 162.  It then considered whether there was reasonable suspicion to justify the further detention. *Id.*

———————

[1] As we recently noted in *United States v. Burton*, 334 F.3d 514, 518 (2003), asking more questions to the occupants of a stopped vehicle than are necessary to issue a traffic citation does not turn a reasonable detention into an unreasonable one, especially when such "[q]uestions hold the potential for detecting crime, yet create little or no inconvenience." (quoting *United States v. Childs*, 277 F.3d 947, 954 (7th Cir.) (en banc))

Since the court immediately considered whether reasonable suspicion was present, it must have considered it obvious that the defendant was detained, for the court does not tell us when the traffic stop no longer justified her detention. It is likely that the court believed that the traffic stop no longer justified her detention as soon as she signed the citation and was then not able to exit the police vehicle.[2] If the court believed that she was detained after she signed the citation merely because she was asked questions that were unrelated to the initial traffic stop, or because she was asked questions at all, then *Mesa* would no longer accurately reflect the state of the law after *Ohio v. Robinette*, 519 U.S. 33 (1996).

In *Robinette*, a deputy sheriff stopped the defendant for speeding. *Id.* at 35. The deputy asked for and was handed the defendant's driver's license. *Id.* After running a computer check on the license which indicated that he had no previous violations, the deputy asked the defendant to step out of his vehicle, issued a verbal warning to him, and returned his license. *Id.* The deputy then asked whether the defendant had any drugs or weapons in his car *Id.* at 35-6. After the defendant answered no, the deputy asked for, and received, the defendant's consent to search his vehicle. *Id.* at 36. Drugs were found in the car during the search. *Id.* The Ohio Supreme Court held both that the defendant's consent to search was the product of an unlawful detention, and that an officer must first inform "citizens stopped for traffic offenses ... [that] they are free to go after a valid detention, before [the] officer attempts to engage in a consensual interrogation." *Id.* The question presented to the Court was whether the Fourth Amendment demanded the *per se* rule that an officer, after the completion of a traffic stop, must inform the person stopped

---

[2]Indeed, after the Supreme Court decided *Ohio v. Robinette*, 519 U.S. 33, this court in *United States v. Guimond*, 116 F.3d 166 (6th Cir. 1997), read *Mesa* to apply only on its facts – where the driver consented to a search only after she had been detained in a locked police cruiser for a considerable period of time.

that he is "free to go" before requesting the person's consent to search his vehicle. *Id.* at 35. The Court concluded that it did not. Although it never specifically addressed whether the defendant was seized when the officer asked him both whether he had any drugs or weapons and for his consent to search his vehicle, I believe, since the Court reversed the Ohio Supreme Court's judgment and since there certainly was no reasonable suspicion to further detain the defendant if he were seized, that the Court concluded, *sub silentio*, that the defendant was not seized when he was asked those questions.

It is well settled that an officer may approach a person to ask questions or seek permission to search, provided that the officers do not imply that answers or consent are obligatory. *See e.g.*, *INS v. Delgado*, 466 U.S. 210, 212 (finding that agents' questioning of factory employees concerning their citizenship did not constitute a seizure); *Florida v. Royer*, 460 U.S. 491, 497 (1983) (observing that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual and asking if he is willing to answer some questions). In *Florida v. Bostick*, 501 U.S. 429, 434 (1991), the Court made clear that these requests are proper without regard to the absence of reasonable suspicion because "mere police questioning does not constitute a seizure." *See e.g.*, *United States v. Erwin*, 155 F.3d 818, 823 (1998) (en banc) (noting that an "officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion ..., and asking him whether he is willing to answer some questions. This includes a request for consent to search [an] individual's vehicle").

It is clear then, after considering the Court's and this Circuit's precedents, that Officer Fisher was entitled to ask the owner for her consent to search the vehicle.[3] *See Bostick*,

---

[3]One may attempt to distinguish *Bostick* or *Royer*, where the officers approached the defendants for questioning while the defendants were not in legal custody, from the present case, where the occupants were in legal

501 U.S. at 434; *Royer*, 460 U.S. at 497. Officer Fisher's request to Collier that he remain outside the car after he had handed Collier the citation so that he could ask the owner for her consent to search the vehicle did not transform the encounter into an unlawful detention. Unlike the occupants of the U-Haul in *Hill*, neither Collier nor the occupants who remained in the car were detained so that a drug detection dog could sniff the vehicle for the presence of narcotics. And, unlike the defendant in *Mesa*, neither Collier nor the occupants who remained in the car were physically locked in the back seat of a police car after the purposes of the traffic stop were completed. Moreover, Officer Fisher's request to Collier to remain outside the vehicle as he went back to the car to ask the owner for her consent to search was reasonable where Officer Fisher knew 1) that the owner was sitting in the rear passenger seat and that Collier would take the front passenger seat,[4] so that if Collier had re-entered the vehicle, he would have needed to speak around him in order to talk with the owner,[5] and 2) if the owner had consented to a search, Collier would have needed to immediately re-exit the vehicle if he had first re-entered after Officer Fisher handed him the ticket.

---

custody until the purposes of the traffic stop were completed, and then were posited questions and asked to consent to a search, by arguing that in the latter case an individual may not feel as if he has a right to refuse the officer's request because he was just in legal custody and, in fact, may believe he still is in legal custody. However, unless the officer's conduct and questions intimated that answers were obligatory, then such a concern would merely go to the voluntariness of the consent, not whether the consent was a fruit of an illegal seizure.

[4] It is clear that Officer Fisher, while he was talking with Collier at the rear of the car, noticed Darnell Richardson exit the passenger seat and take the driver's seat.

[5] Officer Fisher would have needed to talk around the front passenger because he always approached the car on the passenger's side for safety reasons to avoid exposure to freeway traffic.

Since I believe that Officer Fisher was entitled to ask the owner for permission to search her car, and that his request to Collier to remain outside the car did not constitute a seizure where 1) he was not restrained from leaving, and 2) the request was reasonable under the circumstances, I would therefore reverse the district court's conclusion to the contrary.